## KANSAS CITY, Appellant, v. SCARRITT et al.

### Division Two, June 30, 1902.

1. **Lands:** CEMETERY: DEDICATION: LEGAL TITLE. A square was marked, "Donated for graveyard," on an original plat filed by the owner with the recorder of deeds. Five years later a city was incorporated, including within its limits the graveyard. *Held*, that the legal title to the square remained in the original owners, subject to the use of the public, for the purpose of dedication it not having passed to the city by dedication, as the latter was not in existence at that time. (Following Campbell v. City of Kansas, 102 Mo. 326.)

2. ———: ———: ADVERSE POSSESSION: CITY AS TRUSTEE. A city holding land as trustee for the use of the public as a cemetery can not at the same time hold it adversely and for its own benefit.

3. ———: ———: ———: INTENT. In 1847 a square of land was "donated for graveyard" by the original owners, which later became part of a city. In an action in 1874 the city disclaimed ownership in fee, and in another suit, in 1884, averred by its answer that the square was a graveyard; and its counsel in open court declared that the city did not claim the square, and never expected to get it, but did claim it as a graveyard, and had the right to bury there. *Held*, not to show an intent to hold adversely.

Kansas City v. Scarritt.

4. ———: ———: ORDINANCE: ABANDONMENT. The mere passage of a city ordinance prohibiting future interments in, a graveyard did not constitute an abandonment thereof, especially where the bodies were not removed for twenty-one years.

5. ———: ———: ABANDONMENT: REVERSION. The proximity of land to a square donated for a graveyard does not so enhance its value as to prevent possession of the square from reverting to the original owners after an abandonment thereof for burial purposes.

6. ———: DEEDS: EVIDENCE: PARTITION: SALE. Where a court of general jurisdiction had jurisdiction over both persons and subject-matter in partition proceedings, it will be presumed that all the necessary persons were made parties, and that the sale was confirmed, in the absence of any statement in the record in relation thereto; and a deed of such partition was properly received in evidence.

7. ———: ———: ———: EJECTMENT: ADVERSE POSSESSION. A plaintiff in ejectment, claiming title by adverse possession, can not object to the reception in evidence of the deed through which defendant claims.

8. ———: ———: EXECUTED FIFTY YEARS: ANCIENT DOCUMENT. A deed executed more than fifty years before being offered in evidence, and which came from the proper custody, is admissible as an ancient document.

9. Practice: EVIDENCE: OBJECTION. An objection to evidence, "that the offer was too general," raises no question for review.

10. ———: TRANSCRIPT OF FORMER ACTION: EVIDENCE: AGREEMENT OF PARTIES. Where the parties agreed in open court that either might use as evidence parts of a transcript of a former action, subject to objections as to relevancy, materiality, etc., the reception of such transcript will not be reviewed in the absence of any objection thereto.

Appeal from Clay Circuit Court.—*Hon. E. J. Broaddus, Judge.*

AFFIRMED.

*R. B. Middlebrook* and *John Muckle* for appellant.

(1)    (a) The court erred in admitting in evidence, over plaintiff's objection, the deed from James B. Davenport to

William L. Sublette and eleven other grantees, dated August 17, 1843. That deed is void. Not less than a majority of three commissioners, after having been ordered by the court to execute it, could have made a valid deed. The sale was not reported to the court or confirmed, and Davenport was not empowered or directed to make the deed. McCoy v. Ragan, 29 Mo. 365. If there was such an order of court as the deed recites, then it was necessary the sales should be reported to the court, on the oaths of a majority of the commissioners, and if the sale were approved and confirmed, the court was then authorized by law to make an order directing the commissioners, or a majority of them, but not less than a majority of them, to execute a conveyance pursuant to the sale and order of the court. R. S. 1835, p. 421, secs. 29, 30; Rorer on Sales (2 Ed.), sec. 399; Freeman on Cotenancy and Partition (2 Ed.), sec. 544; 1 Perry on Trusts (4 Ed.), sec. 294; Wardwell v. McDowell, 31 Ill. 364; Osgood v. Franklin, 2 Johns. Ch. (N. Y.) 1; Peter v. Beverly, 10 Pet. (U. S.) 532; Dailey's Appeal, 87 Pa. St. 487; Morville v. Fowle, 144 Mass. 109; Crowley v. Hicks, 72 Wis. 539. There is no evidence that the heirs of Gabriel Predhomme received any part of the consideration for the sale to Sublette et al., but if there were, that would not make a void deed valid. Campbell v. Gas Co., 84 Mo. 352; Henry v. McKerlie, 78 Mo. 416; Ringo v. Hughes, 72 Mo. 136. (b) It was error for the court to admit in evidence, at the instance of defendants, the reply, verdict, instructions of the court, and judgment, respectively, in the case of John Campbell et al. against the city of Kansas. Whittaker v. Whittaker, 157 Mo. 353. (c) It was error for the court to admit in evidence all the testimony contained in the bill of exceptions in the said Campbell case en masse. 1 Dillon on Mun. Corp. (3 Ed.), sec. 305. (2) The court erred in giving instructions numbered 1 and 2, respectively, because the evidence did not show that defendants were "the owners of the

record title to said land," and it does not appear that the dedication of the land for a graveyard, about the year 1847, was made "by its then owners." The defendants have shown no title or interest in themselves, or in the Old Town proprietors other than that, if any, conveyed by said Davenport deed. If that deed were valid in other respects, it does not appear that any of the heirs of Gabriel Predhomme was a party to the suit mentioned in the deed, or that his interest was transferred by said deed. "The question of the legal effect of evidence may be raised at any stage of the trial." Pettis County v. Gibson, 73 Mo. 507. (3) In ejectment, plaintiff may rely on any titles he has, even though such titles be inconsistent. St. Louis Public Schools v. Risley, 28 Mo. 415. The city, in its proprietary capacity, could acquire by adverse possession or exclusive continuous possession for ten years, under claim of ownership, the title in fee to the land in controversy, whether it wanted it for a public square, park, graveyard or for public purposes in general. Stephens v. Murray, 132 Mo. 468; Wood on Limitations, p. 93, sec. 53. The title so acquired would not be divested by subsequent declarations or admissions. 1 Am. and Eng. Ency. Law (2 Ed.), p. 886; Byers v. Shepter (Pa.), 5 Cent. Rep. 293; Bruce v. Washington, 80 Tex. 368; Williams v. Wrenn (Tex.), 30 S. W. 509. Certainly, if defendants had no title to the property, it would not follow that the city's title would not be adverse to defendants even if "the city claimed to hold possession of it as a graveyard." There was evidence that the city's possession since 1847 was always under claim of ownership. (4) A graveyard which is "vacated for graveyard uses" and burials prohibited, and in which burials have ceased, is not a public graveyard, "so long as it contains graves and is known and recognized by the public as a graveyard." The conceded condition of the tract of land in controversy, the uses to which it was put from 1860 to 1870 for open commons, camping-grounds, circuses, residences with outhouses

and stables for stock, in addition to its having been vacated for graveyard uses and burials having ceased therein, precludes all idea of a graveyard in legal contemplation. If there was any reversionary interest in the Old Town proprietors, the statute of limitations began to run against them in favor of the city, October 30, 1857, when the tract was "vacated for graveyard uses" and burials prohibited, especially as it is conceded that burials thereupon ceased. Stephens v. Murray, supra; Windt v. Reformed Church, 4 Sandf. Ch. 471; Partridge v. Church, 29 Md. 631; Newark v. Watson, 56 N. J. L. 667; Bradley v. Railroad, 91 Mo. 499; Thomas v. Black, 113 Mo. 66; Dyer v. Winter, 89 Mo. 81; 1 Am. and Eng. Ency. Law (2d Ed.), 809. The land ceased to be a graveyard when the city, by ordinance, forbade other interments therein. · Stephens v. Murray, supra; Newark v. Watson, supra; Campbell v. Liverpool (L. R.), 9 Eq. 579; Page v. Symonds, 63 N. H. 19; Sohier v. Church, 109 Mass. 21. (5) It is for the court to determine whether the use of a tract of land as a graveyard has been terminated by law, or when it ceased to be a graveyard, when the facts are undisputed or conceded. In other cases it is a mixed question of law for the court, and fact for the jury, as to when a disused graveyard ceased to be a public graveyard; and the jury should be clearly instructed as to the law—as to what in legal contemplation constitutes a public graveyard, and what facts and circumstances, when the same appear from the evidence, would show an extinction of that use. That the court did not do. Authorities cited supra. (6) A conveyance of the fee of the ground in controversy to the county "in trust and for the uses therein named, expressed or intended (that is, for use as a public graveyard), and for no other purposes," would convey the fee simple title, absolutely, and leave no reversionary interest in the grantor, unless there was an express provision for a reverter embodied in the deed of conveyance. Stewart v. Egaston, 39 U. S. App. 240; Portland v. Terwilliger, 16

Ore. 465; Rawson v. School district, 7 Allen (Mass.) 128; Field v. Providence, 17 R. I. 803; In re Mercer Home, 162 Pa. St. 232; Barr v. Wells, 24 Pa. St. 86; Curlin v. Campbell, 3 Harris (Pa.) 500; Packard v. Ames, 16 Gray 327; Commissioners Mahoning Co. v. Young, 59 Fed. 96; Woodworth v. Payne, 74 N. Y. 196.

*Scarritt, Griffith & Jones, Wallace & Wallace, John W. Noble, H. A. Loevy* and *H. F. Simrall* for respondents.

(1)    This is an ordinary ejectment suit in which the plaintiff must recover, if at all, upon the strength of its own title and right of possession, and not upon the weakness of its adversary's.    R. S. 1899, sec. 3053; Finley v. Babb, 144 Mo. 403.    (2)    The plaintiff (Kansas City) claims in this suit to have obtained the legal title to the land in controversy by adverse possession.    No record or paper title is claimed by the plaintiff.    The question for the trial, therefore, was one of fact for the jury, and the jury found by its verdict that the plaintiff had not proven a title by adverse possession.    Wilson v. Taylor, 119 Mo. 631.    (3)    It is admitted by both parties that the land in controversy was being used by the public as a graveyard (under the dedication of 1847) when the city of Kansas was incorporated in 1853, and that whatever control or possession the city assumed at that time was for the furtherance of such public use.    In other words, the city assumed, through its police power, to control and regulate the public use of the ground as trustee for the public for graveyard purposes, and this assumption or claim continued up to, and was vehemently asserted in the case of Campbell v. City, 102 Mo. 326.    Under this state of facts, the city can not now claim that its possession was adverse to the owners of the legal title.    Whatever possession it had was under the dedication or license of the owners, as long as the ground was used as a graveyard and as long as the city claimed the possession

of it as a graveyard.   The original possession of the city, held under such a license or dedication, could not be changed into an adverse possession without clear and unequivocal notice to the owners of the legal title.   (4)   The instructions of the court put the plaintiff's claim of adverse possession to the jury fairly, more favorably indeed than the facts of the case justified—as there was a complete failure on the part of the plaintiff to show that it had been in the possession of the ground in controversy in any other capacity than as trustee for the public for a graveyard for any period of time before April 21, 1884, the date of the commencement of the suit of Campbell v. City, supra.   The city's actual possession was sporadic, occurring only twice; once in 1870, when it fenced the square, which act on its part was not inconsistent with its position as trustee, holding the ground as a graveyard, and once in 1879, after it had removed all the bodies and was in the act of converting the square into a park.   The few things done by the city, that its counsel claim constituted "acts of ownership," were done while the square was still a graveyard, as defined by this court, and were not sufficient to even remotely suggest to the owners that the city was laying claim to the title, much less to notify them of such a claim.   Herbst v. Merrifield, 133 Mo. 271; Fugate v. Pierce, 49 Mo. 443; Bowman v. Lee, 48 Mo. 336; Draper v. Shoot, 25 Mo. 202; St. Louis v. Priest, 103 Mo. 655; Huckshorn v. Hartwig, 81 Mo. 651; Lynde v. Williams, 68 Mo. 369.   (5)   The judgment in the case of Campbell against the city is conclusive upon the city as to the question of abandonment and as to the right of the owners (defendants here) to the possession of the property at the commencement of that suit.   It appears in this case, as an undisputed fact, that possession of this property was actually and physically delivered to the plaintiffs in the Campbell case (defendants here) by the sheriff in execution of a writ of restitution duly issued upon the final judgment in the case.   The possession thus delivered related back to the institution of

that suit and precludes the city from claiming any rights under the possession that it held during that litigation. It also precludes the city from claiming any rights by reason of any possession it might have had prior to the institution of that suit. The question of the right of possession as between these parties was settled in that case and executed under the solemn· mandate of this court. Campbell v. City, 102 Mo. 326; Dunn v. Miller, 75 Mo. 272; Jackson v. Rightmyre, 16 John. 326; Jackson v. Tuttle, 9 Cow. 283; Whitney v. Wright, 15 Wend. 171. (6) The deeds made by the Old Town proprietors to other lands could in no way vest the legal title to the ground in controversy in the plaintiff, and plaintiff's contention, therefore, that it obtained the right to the ground through those deeds, would be of no avail in this suit, even if it were sound. Plaintiff can not recover, in an ejectment suit, on an equitable title or right of possession. Kingman & Co. v. Sievers, 143 Mo. 524. (7) It is admitted by the appellant that the defendants are the owners and holders of the record title to the ground in controversy. It is admitted that the land has ceased to be a graveyard and has been abandoned as such. It is admitted that in 1879 the appellant converted it into a park. It is admitted that in attempting such conversion the appellant made the false and fraudulent claim that it was still a graveyard, and that it was then holding the possession as trustee for the public for the purposes of a graveyard only. It is undisputed that the defendants were put in the actual and physical possession of the property under legal process issued upon the final judgment in the Campbell case, and that they have held such possession ever since, and made valuable improvements upon the property and paid taxes thereon. With such a record it is with poor grace that appellant can appeal to this court to set aside the rule of *stare decisis* in its behalf in this case. Price v. Thompson, 48 Mo. 365; Rutherford v. Taylor, 38 Mo. 315; Becker v. St. Charles, 37 Mo. 16; Warren v. The

Mayor, 22 Iowa 351; Trustees v. Council, 33 N. J. L. 19; Boon v. Edson, 18 Ohio St. 226; Hunter v. Trustees, 6 Hill 414; Le Clerg v. Trustees, 7 Ohio 221; Hooker v. Utica, 12 Wend. 371; The City v. Hall, 24 Iowa 244; Washburn on Easements, p. 200; Canny v. Andrews, 123 Mass. 155; 3 Kent's Com. (6 Ed.), p. 448; Reid v. Stouffer, 56 Md. 254; Appeal of Garalent, 1 Atl. (Pa.) 438; Goddard on Easements (Benud's Ed.), 450.

SHERWOOD, P. J.—Ejectment for that certain block of ground in Kansas City bounded by Missouri avenue, Locust street, Independence avenue and Oak street, which was formerly the subject of controversy in Campbell v. City of Kansas, 102 Mo. 326. Ouster laid as of December 19, 1890, and damages in the sum of $10,000 demanded.

Defendants in this action, or their predecessors in interest, were plaintiffs in the former case, and were put in possession under a writ of restitution upon final determination of the former action. Shortly after such restitution, plaintiff renewed the legal contest by bringing the present possessory action, to recover possession of the premises thus lost, but upon the resultant trial again suffered defeat, and now, for the second time, questions the correctness of such outcome by this appeal. The facts out of which this litigation arose are briefly as follows:

In 1843, John C. McCoy and others acquired, at a partition sale, a tract of land which included within its bounds the *locus in quo.* In June, 1847, McCoy made a plat of the part of the property which he and his associates had acquired, laying off one hundred and fifty lots for sale, and dividing the balance of the tract into portions which he designated as "lands." One of these "lands" was No. 21 upon the plat, and is the same property now in dispute. In the following September, these so-called "lands" were divided among the fourteen proprietors, and that "land," "No. 21" was

marked on the plat by McCoy, "Donated for graveyard." The plat was never signed or acknowledged by anyone, but two years later was deposited in the office of the recorder of deeds. It seems from the evidence that even before this donation the property had been used for the interment of human bodies, and was so used by the general public until 1857; and occasionally burials took place there up to 1862.

The plaintiff city was incorporated in February, 1853, and this particular plat of ground was included within its corporate limits. In October, 1857, the city passed an ordinance prohibiting further interments in this graveyard, and declaring it vacated for burial purposes, but it appears that at that time none of the already-interred bodies were removed. Until 1866 the plat seems to have remained in unchanged condition, except that during the war it was much neglected, and some of the tombstones and fences broken down. About the latter year some of the bodies were removed to other places of sepulture, and in 1870 the city inclosed the graveyard with a plank fence, which remained standing but a year or two. Between 1872 and 1874 the city undertook to grade all the streets about the graveyard, and in so doing all of the old fence which remained was completely destroyed. During the progress of the work, many human remains were encountered, and this caused a removal of almost all of those yet remaining. From that time forward the property presented the usual appearance of a neglected graveyard, until the spring of 1878, when the city proceeded to grade the property to the level of the established streets surrounding it, using the prisoners serving sentences in the city workhouse in performing the work, which was in progress for some time, but finally completed during the summer of 1879. While it was going on, all the graves which remained were removed. The remains of those which could be recognized were interred in other suitable places, and those incapable of recognition were gathered together in boxes. Af-

ter completion of this work, all traces of a burial place were destroyed, and there was no feature about the property which would give a clue to its former or present use. It is in evidence, however, that the city conceived the idea of placing monuments or small slabs of stone underneath the surface of the ground for the purpose, as was said, of indicating the existence of graves, but nothing was left upon the surface which might indicate the former nature of the property, and, after the present defendants got into possession, a search for bodies was made under these small pieces of stone, but no traces were found of either human remains or boxes in which they might have been buried.

It further appeared in evidence that the city, by its ordinance of March 5, 1868, condemned an alley through the center of the block, and in 1872, by its answer in a certain cause then pending in the circuit court of Jackson county, wherein one Grant was plaintiff and the city defendant, the latter averred "that the defendant has never owned, and does not now own in fee simple absolute, the lot or parcel of ground described in the petition or any part thereof;" and that upon the trial of the former case (to-wit, that reported in 102 Mo. supra), the attorney for the city, in response to an offer of certain evidence, said: "The city don't claim the square, and never expects to get it. They claim it as a graveyard, and have the right to bury there, and people are buried there now." On behalf of defendants here it was also shown that in its answer in the Campbell case, the city averred that "said land No. 21 is now, and was since June, 1847, and has been, a graveyard, and that the city of Kansas City has, during the last fourteen years, expended large sums of money in and upon said graveyard."

The answer of all the defendants save one, after admitting possession and denying the right of plaintiff, set up

Vol. 169 mo—31

the foregoing action and conduct of the city by way of estoppel, and pleaded that since the judgment in the former case the plaintiff had assessed and collected special taxes and assessments against the property, and had in other ways recognized the ownership of the defendants. The other defendant stood upon a general denial. After the city had joined issue by filing a reply in the nature of a general denial, the venue was changed to Clay county, where a trial was had, with the result above stated. The city now prosecutes its appeal from that judgment, and seeks to overturn the ruling which the trial court made in accordance with the opinion of this court in Campbell's case.

1.  At the outset, it will be seen that the plaintiff's claim is not supported by any paper title, but must rest either upon the dedication of 1847, or adverse possession for the statutory period after an abandonment of the purposes to which "land No. 21" was dedicated. Upon its title, as it makes it out in evidence, the city must stand or fall, as it can not derive any aid in this action from any infirmity of defendant's title, and it is to the former, therefore, that we first look. The first proposition amounts to a contention that the legal title to this property passed out of the owners by the dedication of 1847, and that instead of being a donation for a particular purpose only, or the grant of an easement for public use, it was the transfer of a fee simple absolute title, so that in no event could there be a reversion.

The argument itself suggests the inquiry, In whom did the legal title vest, if it passed out of the original owners under the dedication? It must, of necessity, have vested somewhere; for it could not remain in suspense or abeyance. Certainly it could not have vested in the city, because it was not then in being, and it is equally clear that it could not have been lodged in so indefinite a grantee as the general public. The only possible conclusion is that reached by this court in the former case, that the legal title remained in the

original owners, subject to the use of the public for the purpose of the dedication, and as no subsequent act on their part is shown which could have the effect of a transfer, it must still be in them, unless they have lost it by the adverse possession of plaintiff. No legal legerdemain could divest them of their rights when the municipal corporation was subsequently organized, or at any other time. In support of this proposition, counsel for plaintiff have woven in the loom of their minds an elaborate and ingenious argument, but it is not in accord with the prior rulings of this court which have gone unchallenged for many years, nor with the adjudications in other jurisdictions, and we are consequently unwilling to give it sanction.

Upon the proposition as to adverse possession, it is only necessary to say that in order to support it plaintiff must have shown not only the elements which are ordinarily usual and essential for the establishment of such a claim, but, in addition thereto, an open and avowed repudiation of the easement, and a holding adversely to it for the statutory period. It could not hold the land as trustee for the use of the public as a cemetery, and at the same time hold it adversely and for its own benefit. The city does not enjoy any greater privilege in this regard than any other litigant, and it has always been held that a party in possession of property in privity with the rightful owner, or in accordance with the terms of a demise or grant from him, can not begin to hold adversely to him, or to the terms of the grant or demise, without first laying a foundation by open and explicit repudiation and denial, and this, too, accompanied by, and coupled with, an abandonment and surrender of the premises, and then a resumption of them under claim of the adverse right. Illustrations and instances of this familiar and shopworn principle abound on every hand, and cover many pages of our reports as well as of the horn-books of the profession. [Emmel v. Hayes, 102 Mo. loc. cit. 199, and cas. cit.; Meier

v. Meier, 105 Mo. loc. cit. 432, and cas. cit.; Downing v.
Dinwiddie, 132 Mo. 99; Stewart v. Miles, 166 Mo. loc. cit.
181, and cas. cit.; Fleming v. Mills, 55 N. E. 373.]

Besides, intent becomes and forms a large factor in de-
termining the nature of the possession alleged to be adverse,
and in no manner can intent be better judged than by words,
actions and conduct. Subjecting the claim of plaintiff to
this test, as well as to other considerations supported by the
above-cited authorities, it would seem that its possession falls
far short of the requirements of the rules above laid down.
By its answer in Grant's case in 1874, the city solemnly
disavowed claim of ownership in fee; in 1878 its common
council enacted an ordinance directing the city engineer to
cause the property to be "prepared for cemetery purposes
at once;" in 1884 it filed its answer in the Campbell case,
averring that it was then, and, since 1847, had been, a
graveyard, and that it had spent large sums of money upon
it as a graveyard, and during the trial of that case its
counsel in open court asserted that "the city don't claim the
square and never expects to get it. They claim it as a
graveyard, and have a right to bury there, and people are
buried there now." It would be difficult, indeed, to map out
a line of conduct less in accord with the claim plaintiff now
makes, and in the face of it all the assertion that, at the very
time of such acts, the property had ceased to be a burial
place and was held by the city for its own and general pur-
poses, is more remarkable for boldness than sincerity.

But, says plaintiff, if there was any abandonment, it
occurred in 1857, when by ordinance the city forbade any
further burials, and the reversionary interests having then
sprung up, the city acquired title by adverse possession, prior
to the institution of the Campbell suit. This contention is
quite as fallacious as it is inconsistent, besides having no such
facts to originate an adverse holding as are required by the
above-cited decisions and authorities. This contention, as

will be observed, assumes that the mere prohibition of future burials in itself worked an abandonment, but there can be no such magic in the simple declaration of a legislative intent, especially when it is not accompanied by any act of performance, or any other act of notification, as above indicated, to the reversionary owners. A cemetery is none the less a graveyard because further interments in it become impossible. It only loses its character as a resting place of the dead when those already interred are exhumed and removed. Notwithstanding the ordinance of 1857, the graves were undisturbed until 1866, and not until 1878 were all of the bodies removed from the premises.

2. It is next urged upon us that there could be no reversion in this case because the dedication of 1847 was not a donation, in that the public, in purchasing the lots laid out on the plat, paid an enhanced price on account of the dedication; but there is neither novelty nor merit in the contention. It was before this court in the former case and was then disposed of in these words: "It may well be that the dedication of highways and parks furnishes a valuable inducement to purchasers of surrounding property. But I do not think that the proximity of, or convenient access to, a graveyard can be reasonably classed among the inducing causes of the sale of real estate." [Campbell v. City of Kansas, 102 Mo. loc. cit. 356.] To these words it may be added that the argument amounts to an arbitrary assumption of a very doubtful question. Almost every one knows that a burial ground does not enhance the value of the surrounding property, and there is no reason why courts should pretend to be more ignorant than the rest of mankind.

If, as suggested by plaintiff, the lots laid out for sale could not have been injuriously affected by the existence of the cemetery because the nearest of them was distant four hundred and twenty feet from it, the same circumstances would serve as a reason why they were not bettered by it.

There is a self-evident distinction between donation for a public park or common, and one for a burial ground, and the case of Goode v. St. Louis, 113 Mo. 257, and other authorities cited by plaintiff, have no bearing on the instant case.

3. As a further argument against a reversion, it is said that the court below erred in admitting the deed of the commissioners in partition to the fourteen original owners; that the deed was void and, therefore, defendants did not demonstrate their right to the reversion. This deed bears date August 17, 1843, and recites that by order of the circuit court of Jackson county, at the April term, 1838, it became the duty of Peter Booth, James B. Davenport and Elliott Johnson, commissioners appointed by the court, to sell at public auction, after due notice, certain real estate in the said county belonging to the representatives of Gabriel Predhomme, deceased; that such notice was duly given and a sale had on November 14, 1838; that at such sale William L. Sublette and others were the highest bidders; that the said property was sold to them; after the said sale two of the commissioners, Booth and Johnson, died, and that, therefore, the survivor, Davenport, for the consideration named, gave, granted, bargained and sold to the said Sublette and others (naming them), the property described, together with all the right, title and interest of the heirs and legal representatives of said Predhomme in and to the same. The appended acknowledgment, taken in open court at the August term, 1843, recites that satisfactory proof of the death of the other commissioners was made and that "the said Davenport, commissioner as aforesaid, being personally known to the court, acknowledged said deed to be his act and deed, for the purpose therein mentioned, which is ordered to be certified and indorsed on said deed."

Plaintiff contends that the deed is void on its face because executed by only one of the three commissioners, and

because it does not appear that the sale was ever confirmed, or that *all* the heirs of Predhomme were parties to the partition case, and section 39 of the partition act of 1835 is cited in support of the contention. The circuit court of Jackson county was a court of general jurisdiction; had jurisdiction over both persons and subject-matter, and, therefore, though the record be silent on the subject, it will be presumed that *all* of the heirs of Predhomme were made parties by appropriate procedure or voluntary action on their part, and that the sale was confirmed. [Huxley v. Harrold, 62 Mo. 516, and many subseq. cas.]

Aside from the fact that no defect in a defendant's title can serve to aid a plaintiff in ejectment, the deed, whether vaild or void, or merely voidable, could neither strengthen nor weaken plaintiff's claim of adverse possession. In addition to that, it was shown in evidence from the transcript of the testimony in the former case, that counsel for the city, upon an offer to read the record in the partition case, admitted that "the deed made by commissioner Davenport to the original fourteen Old Town proprietors carried the title to the quarter section of land therein mentioned to the parties named therein."

The deed was, however, entitled to admission as an ancient document, coming, as it did, from the proper custody, and needed no other proof than that it carried on its face. [1 Grlf. Evid. (15 Ed.), secs 23, 27, 141, 570; Long v. McDow, 87 Mo. 197; Endsley v. Strock, 50 Mo. 508.] And that admission was a solemn admission made in open court. [1 Grlf. Evid., secs. 186, 205.]

And even if it did not have the effect of conveying the *legal* title, yet it certainly did convey the *equitable* title, and such title would have been an amply sufficient basis on which to resist ejectment if brought by Predhomme's heirs (Long v. Joplin Mining Co., 68 Mo. 422, and cas. cit.) and *a fortiori* sufficient if brought by the plaintiff city.

Plaintiff, however, seeks to avoid the effect of its admissions in this and other particulars by showing that the transcript of the testimony given in the Campbell case, was improperly admitted in evidence in the present instance. According to the record which plaintiff has brought here, the only objection it raised in the lower court, when defendants offered the testimony contained in the transcript, was, "that the offer was too general." Such an objection, which in and of itself lacks certainty, raises no question for an appellate court. Furthermore, it is also disclosed that counsel for the respective parties agreed in open court, at the trial of this case, that either party might use such parts of the transcript referred to as desired, subject to objections as to relevancy, materiality, admissibility and competency, but it nowhere appears that plaintiff raised any such objections, although it seems to have read in its own case such parts of the transcript as it deemed beneficial.

Other questions raised by plaintiff need no discussion, as it results from what has already been ruled that there was no error prejudicial to plaintiff, either in respect to evidence or instructions to the jury; and so, being persuaded the judgment was for the right party, we affirm it. All concur. *Burgess, J.,* does not concur as to remark about surrendering possession and then resuming it; he thinks notification of hostile intent sufficient, and *Gantt, J.,* thinks the same way.